OPINION INTRODUCTION
This matter is before the court after a trial on a stipulated record. Plaintiffs who are individuals (taxpayers) challenge actions of Defendant (the department) in asserting they are liable to Oregon tax on certain transactions. This decision is the first step in resolution of the differences that separate the parties. The department has filed a counterclaim which it agrees is rendered moot if a decision on this step of the proceedings is in its favor.
 FACTS
The facts have been stipulated and are, in relevant part, as follows. Individual taxpayers Terry Pinna, C.G. McKeever, James E. Bryant, and Camella L. Ryan (taxpayers) are shareholders of Crystal Communications, Inc. (Crystal), an Oregon corporation organized as an *Page 2 
S corporation under the Internal Revenue Code (the Code). (Stip Facts at 1, ¶ 1.)[1] During the tax years at issue, taxpayers were nonresidents of Oregon. (Stip Facts at 2, ¶ 1.) The following sets forth the origins and functions of Crystal and its activity leading to the present appeal.
In 1988, The Cellular Corporation (TCC) solicited taxpayers to participate in the Federal Communications Commission (FCC) lottery being held to distribute licenses for the operation of cellular communication systems in rural regions of the United States. (Stip Facts at 4, ¶ 5). In connection with the FCC lottery, TCC assisted taxpayers in forming a California general partnership named Crystal Communications Systems (the partnership) for the purpose of holding the FCC telecommunications system license for the Oregon #1 Rural Service Area (the RSA), covering Columbia, Clatsop, Tillamook, and Yamhill counties (the FCC license). (Stip Facts at 4-5, ¶¶ 5-6, 8.) The partnership agreement stated that "[t]he sole business for which the Partnership is formed shall be to carry on the business of ownership, management and operation of cellular telephone systems and applications for licensing with respect thereto." (Stip Facts at 5, ¶ 6.) Before the lottery, the partnership entered into a Risk Sharing Agreement with TCC. (Stip Facts at 5, ¶ 7.) TCC also did the same with several other partnerships they had assembled for the FCC lottery. (Id.).
In December 1988, the partnership was selected, through the lottery, as the tentative selectee for the RSA. (Stip Facts at 5, ¶ 8.) After reviewing the financial capability of the partnership and taxpayers' backgrounds, the FCC awarded the partnership a construction permit for the radio station and call sign for the RSA (the FCC Authorization). (Id.) The FCC Authorization required the partnership to file an application for a radio station license within 18 months of the original award date; otherwise, the FCC Authorization would expire. (Stip Facts *Page 3 
at 5-6, ¶ 8.) This meant that the partnership had 18 months from the date of the FCC Authorization to construct a cell tower in at least one location of the RSA; failure would result in the partnership losing its ability to obtain the FCC license. (Stip Facts at 6, ¶ 8.) A further requirement of the FCC Authorization was that the partnership had five years from the date of the FCC Authorization to provide complete service coverage to the entire RSA territory; otherwise, competitors would be allowed to provide service to the areas not served in the RSA. (Stip Facts at 6, ¶ 8.) On March 21, 1991, the FCC gave the partnership the FCC license to operate a radio transmitting station. (Stip Facts at 7, ¶ 12.)
In July 1990, the partnership contracted with McCaw Cellular Communications, Inc. (McCaw)[2] to finance the construction and operation of the RSA and to provide switch sharing, maintenance, and other related services. (Stip Facts at 6-7, ¶ 10.) McCaw was affiliated with Interstate Mobilephone Company (IMC), which owned the cellular licenses for the Portland and Salem metropolitan market. (Stip Facts at 7, ¶ 10) The partnership, McCaw, and IMC entered into an "`Agreement in Principle Regarding the Operational Cooperation'" of the RSA. (Id.) The agreement stated that McCaw's responsibilities were subject to the partnership's "`continuing oversight, review, and control.'" (Stip Facts at 7, ¶ 11.) The reason for the "`continuing oversight, review, and control'" was because the partnership was not permitted to transfer the FCC license without FCC approval. (Id.) Compliance with FCC rules also prohibited control by anyone other than the partnership. (Id.)
McCaw, on several occasions, attempted to purchase the partnership. (Ex E-3 at 7.) In September 1991, McCaw offered to purchase 51 percent of the partnership's interests with a commitment to eliminate the FCC petitioners, discussed below. (Id.) The partnership "flatly *Page 4 
turned down this offer." (Id.) Further, after receiving these offers, the partnership "made the decision to separate itself from the other risk-sharing partnerships." (Id.) This was the partnership's goal and it would take precedent "other than the development of [its] market." (Ex E-3 at 8.) Further, in later years, Crystal turned down additional investment offers, including one from Unique Communications Reno (Unique) and TDS (US Cellular). (Ex E-3 at 9, 22.) With regard to Unique's offer, Crystal thought the offer was "worth much more" and with regard to US Cellular's offer, Crystal "decided not to entertain as it would not be in [Crystal's] best interest at this time."
[1] Erica Pinna and Myra McKeever are party plaintiffs by reason of having joined in the filing of a joint return, but were not shareholders in Crystal.
[2] McCaw later merged with a wholly owned subsidiary of AT T in September 1994. (Stip Facts at 12, ¶ 21.)